May it please the court, Francesca Porchero on behalf of defendant appellant James Tyndal. Mr. Tyndal was detained because he parked a large rental truck with its two right rear tires and only those two tires on the curb of a side street in suburban Gresham, Oregon during the early morning hours. It was near a store that was then open for business. As the record subsequently showed, his companion, his girlfriend, was inside the store at that time. Counsel, once he admitted that he had driven to that parking spot, he could be asked for his license even though he hadn't driven far because he had driven on a public street even if it was 10 feet or 5 feet or 2 feet. And his license was suspended. How does that play into your argument? If Judge Graber you're asking whether the officer could ask him for his driver's license or whether the officer could detain him, I'd like to answer those questions separately. Under Oregon law, if a police officer doesn't witness the traffic violation, he does not have authority to detain the driver for that traffic violation. Officer Silva admitted that he had not witnessed the traffic violation. Furthermore, the only traffic violation that's in the record and that I can think of to offer the court is the one that was ultimately offered by Officer Silva, and that is that Mr. Tyndal might have failed to maintain a traffic lane. But as it turns out, under Oregon law, ORS 811-410, excuse me, I think I missed, yes, it's 410, I don't know the exact paragraph, that is only a violation if the driver is on a street that has clearly marked lanes for traffic and he couldn't change lanes safely. I think we're talking past each other. Was he driving while suspended or not driving while suspended? As far as the record shows, the officer did eventually learn that his driving privilege was suspended, yes. But the grounds for the detention was what I was trying to respond to. At what point was there a detention? Was there a detention in the initial encounter? According to what the district court concluded, yes. The detention, and that's the only finding I think that we have before us, I think it is arguable that it could perhaps have happened slightly later after Officer Silva was asking the interrogation-type questions that he was asking. But in any case, he was certainly detained before Officer Silva asked him to show him his Oregon driver's license. So the court said this was a Terry stop when he originally approached him? That's correct. And at ER 80 and 81 are the district court's conclusions about that stop, and according to the district court, Officer Silva had a reasonable suspicion immediately upon meeting Mr. Tindall. And the only facts in the record of what the officer had observed at that point were that Mr. Tindall had parked this truck, that the right rear tires were up on the curb, and Mr. Tindall was walking in the direction of the 7-Eleven store. At that point, according to the district court, there was a reasonable suspicion. I thought the district court found that the operator of the vehicle was searching around the vehicle with a flashlight. Was that not part of the finding? It was. At the initial stop? It was. What the officer had described was that he saw Mr. Tindall getting out of the truck, climbing out of the truck is what he said, and looking on the ground under the driver's door with a flashlight. And then he was walking toward the back of the truck, heading toward the 7-Eleven store. And at that point, that was when the truck had its two right rear tires on the curb. But you're correct, Judge Graber, he did see him looking for something under the driver's door. I hadn't mentioned that because it seems wholly consistent with innocent activity as it came out later, searching for something under the driver's door had nothing to do with any criminal activity. That isn't really the test, because an awful lot of things can supply reasonable suspicion, even if they are also consistent with innocent activity. Almost any one thing can be consistent, but that isn't really the test. You're correct, Judge Graber. It's the degree of suspicion that might attach to activity that is otherwise innocent that makes the difference. And Sokoloff says that very plainly. But still, the innocent activity must add up to something that gives a police officer a reasonable suspicion of something criminal. If the activity, even if unusual or seems different from what one might expect on that street corner, if it's all innocent, it still does not rise to the level of reasonable suspicion. And what we've got here is not a case where there's innocent activity that all adds up to an indication of something criminal going on, like a high-crime area or someone fleeing from the scene as soon as the police officer arrives. All of those things are innocent activity, but under some circumstances can add up to a reasonable suspicion. And I would – The threshold for reasonable suspicion is not that high. I agree with you. And I think in this case, it is still lower than that. Even the police officer, Officer Silva, said that he had no indication that Mr. Tindall had committed any crime. That's in the excerpt at page 35. Officer Silva had no reasonable suspicion of criminal activity according to what Officer Silva said. So he himself did not think that a crime had been committed. Unusual behavior, perhaps, but unusual behavior and criminal behavior are very different and that what we've got is a man who is trying to drive this enormous truck. It's a rental truck, clearly not one he's going to be accustomed to driving, and he's dropped something. It had turned out to be his key. I guess it seems to me that – I guess I keep coming back to this driving while suspended problem because if he knows that this car that is U-Haul and whatnot has been driven by this person onto a public street, he has the right under Oregon law to request to see a driver's license because he's been driving on a public street. He does that, and the guy has no license. Now, at that point, doesn't he have the ability to arrest him for driving without a license or driving while suspended? And doesn't everything else follow from that? The difficulty, I think, Your Honor, is that the police officer does not have the right to request to see Mr. Tindall's driver's license. If he – simply because he believes he was driving on an Oregon street. But he said he had been driving. He admitted he had been driving, but to detain someone, the detention it requires to have someone display his driver's license. Well, it's not detention yet. I guess that's – every time an officer says to a driver, may I see your license, please, is that a detention in your view? No, it's not. Okay, so at the point that he says, oh, you've been driving, may I see your license, please, that's not a detention yet. It's only, as I understand the record, it's only after he can't produce the license that there's a detention. But I don't understand why that's improper once he now knows that he's driving without a license. And this was some of the difficulty in the briefing as well. It is changing the factual theory and the legal theory of what the record shows before the district court. And if I may finish this answer but still preserve some time in rebuttal. It is true that sometimes a police officer's request to see a driver's license, depending on the totality of the circumstances, is merely a consensual encounter not implicating the Fourth Amendment. That's not what we have on the record here. We have a conclusion by the district court, because it was conceded by a counsel for the government, that Mr. Tindall was in fact detained. So the request for a driver's license certainly can go both ways. It can be an amicable request. It can be a request during which the driver remains free to go. But this was not one of those cases. It was clearly stated in the moving papers before we had our motion to suppress, and it was clearly stated at the motion to suppress when the court inquired of counsel whether there was a concession of detention. And I would ask the court to consider Ninth Circuit law in terms of that theory changing on appeal. If it's a mixed question of law and fact like this one, that is not something that the record can support. We have a factual conclusion by everyone involved that what we're talking about on this occasion is a detention. Counsel, so you're saying that the government conceded that there was a detention at what point, when he asked for the driver's license? I don't believe that the government made that, made it, excuse me, tailored it to the request for driver's license. I believe the government's concession was at the initial encounter stage, as the district court concluded, that when he first approached Mr. Tindall with his right rear tires up on the curb. Where is that in the record that the government made the concession that the initial approach was a detention? At ER 61. The court says, the court inquires at the hearing of government counsel, is it true that the government concedes there was a detention? And Mr. Noonan responded, Your Honor, there certainly was some brief detention. But mine, that's at ER 61. Everybody concedes that there's a detention at some point, but the exact point is the issue. And whether that happens when he says, you know, what's going on at the very beginning, or whether that happens after he's asked for the driver's license may make all the difference. That was my question to you. My question was whether or not the government conceded that the initial encounter was a detention. And you told me yes. And I ask you, where was that in the record? ER 61 does not concede that there was a detention at the initial encounter. Nor is that what the district court found. May I elaborate? The court's question to the government came after my argument on the motion to suppress, about there having been a detention before the request for an Oregon driver's license. And that's when the court turned to counsel and asked that question, saying, before you begin, is it true that government concedes that there was a detention in this case? The context of the argument is about the moments before the driver's license. I also would direct the court to, in the moving papers, it's CR 20, CR 21, I believe, is the government's first memorandum of law against our motion to suppress. And in that response to our original motion is when the government had conceded that there had been a brief detention, even before the request to show a driver's license. Now, let me ask you this. Your contention is that even if the government was wrong, I know you don't agree with this, but even if the government was wrong as a matter of law in characterizing what happened before that as a detention, they're bound by that and so are we? On this record, I believe that the court is, yes. And that is because of how the hearing was conducted around that concession. In other words, the question of whether it's a consensual encounter or a detention, as the court knows, is a mixed question of law and fact. The record is developed differently if the issue is a consensual encounter as opposed to a detention. You're acting as if there's just two ends of the spectrum. Your statement is either it's consensual or it's a detention. There's stuff in between, too, which is the Terry stop is in between conversation and detention. It's a continuum. There's not just two ends. I don't mean to imply that there are just the two ends. I'm trying to focus on the difference between whether a police officer needs any reasonable suspicion of criminal activity versus that moment where the police officer did need a reasonable suspicion of criminal activity. And whether the officer needed one or the other for Fourth Amendment purposes is a mixed question of law and fact. And the reason I think the concession matters is that it alters the record below. It was from the moment the motion to suppress was filed and the government answered, the entire record was developed around this question of was that initial encounter before the request for the driver's license or upon request for the driver's license a moment in Fourth Amendment jurisprudence when an officer needed to have reasonable suspicion of criminal activity. Thank you, Counsel. We'll hear from the government, and we've asked quite a few questions, so we'll give you a minute for rebuttal. Thank you, Your Honor. May it please the Court, Mr. Cerro, Frank Noonan appearing this morning for the government. And perhaps, Your Honors, if I might, first of all, with respect to the question of what the concessions were, if there were some, I don't want Mr. Cerro or this Court to certainly think I was trying to trick someone into complacency or if you find that somehow the government waived something, then I guess that's for you to decide. But I would call your attention to ER 62 immediately after the, we were engaged in this discussion of what was and was not a detention and how unreasonable was it where I responded to one of the questions from Judge Mossman as follows. Well, I think, Your Honor, some of the cases, for instance, Wilson, the case that's cited in the government's memorandum recognizes the line, recognizes that the line between some brief informal detention and routine investigation is often awfully blurry. And I don't think the case ought to turn on whether we call this a brief informal detention or investigation. Now, it may be that that was not a terribly artful use of the word, but I don't think this Court is bound by my view anyway. Let me ask you this. If the government did concede in the court below that the initial encounter was a detention, let's go to the issue raised by the appellant in the reply brief. Is the government procedurally permitted to now argue that the initial encounter was a consensual encounter? I'm not going to argue on the floor of the Bostic consensual encounter. And, Your Honor, what I intended to suggest in that reference in the brief is that in any analysis that this court makes regarding those sorts of stops that are less than probable cause, the Terry stops, that the court, in addition to analyzing that quantum of evidence that a police officer may have, is it reasonable or not? Also, I think in all of those cases, analyzes the quantum of force used so that, for instance, in this case, when Officer Silva saw the car parked on the curb and he saw the defendant out walking around, if he had jumped out of his car, pulled his revolver, said, you know, lay down on the ground or something like that, well, we wouldn't be here and you wouldn't be having much trouble deciding this case. That's what I'm trying to suggest. And I think I'm entitled to make those arguments on appeal. Certainly my saying the search is legal or illegal is way beyond any powers that I might have. Well, but there's a difference between taking a position of whether it's legal or illegal and making a concession for purposes of a court ruling. If you make a concession that there was a detention, I think that you should be held to that in further proceedings. So would you disagree with that? I would disagree with the proposition that I agreed there was a detention immediately in this case. Did it ripen into a detention? Of course it did. There, of course, came a time when Officer Silva was not going to let the defendant go. No question. Opposing counsel directs our attention to clerk's record number 21, where she says that in your opposition to the initial motion, the government conceded that there was a detention before the license was requested. Your Honor, I don't have that document in front of me. I'm sorry. If I could pass to the other arguments, and I apologize if I cause you to have to struggle with an issue that may be too big. Leaving aside the question of whether the government made a concession to which it is bound, I understood your answer to Judge Rawlinson, although indirect, to be, yes, if we made a specific concession and the case went forward on that basis, we're bound by it, but I don't think I did that. That's correct. That's how I understood your answer. But if you find I did that, that's where I am. I'm bound. Assuming now that we're operating free of that, would you now tell us what you think the nature of the initial encounter was, apart from the question of concession or no? Thank you. What was the level of suspicion required and what happened as it went forward? Thank you very much, Your Honor. I would respond in two ways. First of all, I think there are two bases which justified what Officer Silva did. The first is that he testified that as soon as he saw the truck, he noticed that the tires were up on the curb, that that was a parking infraction. He noticed also the defendant out of the vehicle, shining a flashlight, looking around. He approached him. He asked for an Oregon driver's license, and I believe his testimony was very direct on that issue. As soon as the defendant could not produce an ODL or a driver's license, but produced instead Oregon identification, he knew two things. One, the defendant failed to present a driver's license and was driving, for which he could arrest him. Two, thank you, I'm skipping ahead already, that he believed that that happened because he was driving while suspended. That's why he didn't have the driver's license. So that's the first justification. Then there is, I think, a second justification, and that justification is the justification presented in the Wilson case, this Court's Wilson case, following the Rios and Busby cases, and also in the Oregon decision, the Head case. Now, the statutes have changed since Head, but I think the Head proposition of law is still sound, and that is that this officer had a reasonable basis to make inquiry and investigate. It's 4 o'clock in the morning. There's a U-Haul truck parked up on the curb. There's someone out on the sidewalk looking around, using a flashlight. Those circumstances, I think, required him, even though he may not, although I'm arguing twofold, I guess. One, he did have a specific violation in mind. But secondly, even if he did not, that that gave him certainly some reasonable basis to do what he did,  and that was why I mentioned in the brief this business about it being a consensual encounter. He did not use force. He did not display a weapon. He didn't put his hands on the defendant. It was a very reasonable thing for the officer to do. So on both of those grounds, I think he had reasonable suspicion to investigate, and I think that he also had the very specific violation in mind, which was a parking violation. It raises the question which Judge Mossman raised, and I think is a good one. During the latter stages of our argument in the trial court, he asked, did the officer have to have reasonable suspicion of a specific crime, or was it enough, I think his phrase was, that the officer thought there was something weird afoot? That's the issue that these cases often raise. I think here we do have a situation where there is the parking infraction, very specific. But we also have an officer who I, in my opinion, is entitled to reasonably investigate because there is something weird afoot. Now, he didn't have any basis to believe that Mr. Tyndall was in possession of stolen mail.  But on these facts, with these kinds of cases, I would hope the court would find that a police officer acting appropriately was really bound to at least make some limited investigation. And the limited investigation that Officer Silva did here was really not very intrusive. We're not talking about, as Wilson suggests, something that's arbitrary or harassing. A very limited intrusion that very quickly led to a very sound basis, driving while suspended for an arrest. Let me just ask you this. It's clear the officer never saw Tyndall operate the truck. It's clear that there was a parking violation at best. Under those circumstances, was it reasonable for the officer to ask Tyndall for his driver's license? Yes, I think so. I think the statute that we cite in the brief and the statutes that we argued below would give him the right to do at least that, to ask for identification. And when he saw that he didn't have identification, then the officer's conclusion, based on his experience, was probably driving while suspended. Did he know that he was the operator of the vehicle at the time he asked? Well... Did the conversation proceed to that point? I think he's the only one in the area around the vehicle. And my recollection of the record is that Mr. Tyndall gave two different explanations. Well, I guess what I'm trying to... But he did... I'm trying to remember whether... My recollection may be in error, and that's why I'm asking you, because it was my recollection that by the time Silva asked for the driver's license, he had reason to believe that he had been driving... He did, Your Honor, and if I can refresh the... I believe that conversation occurred because when the officer approached, he testified that Mr. Tyndall initially said he hadn't been driving, and then he said, oh, I had been driving, but I only drove from the 7-Eleven. And that is... But that happened before he asked for the license. I could be mistaken, too, but I'm pretty sure it did. Perhaps opposing counsel... I'm pretty sure it did. No one rebuttals. Thank you, Your Honors. Thank you. Mr. Chair, I will give you a minute for rebuttal, and if you would be kind enough to help me with that piece of information that I'm not sure I remember. Yes. Mr. Tyndall had told the officer that he had moved the truck from the 7-Eleven lot to its place on the street before Officer Silva requested the driver's license. And I wanted to come back to Judge Rawlinson's request. It's actually CR 20 where the government's response to our motion appears. But finally, if the court instead is taking a look at the moment of the request for the driver's license as the first time when detention begins instead of earlier, and as you know, I think that's going outside the record, but I understand the court's concern. If you don't believe there was a detention until that moment, I would like to call the court's attention then to those portions of the record that show what happened after that moment. Upon the demonstration of an Oregon ID card, Officer Silva still did not have probable cause to arrest Mr. Tyndall for driving while suspended. To do that, he would have to take his identification, go to his car, do a computer check, and find out about his privilege.  He was driving without a license. True, and then that goes back to merely the traffic violation level. Driving without an operator's license at all isn't a traffic crime? It is. It's a traffic violation. Indeed, I'm distinguishing there between the violation and the misdemeanor. But what an officer must do at that point for the detention to be reasonable, I believe the court is aware, would have to be to focus the inquiry from that point on on investigating that traffic violation. Oregon is very clear that the detention for any traffic violation is meant to be very specifically tailored to that traffic violation. As you well know from the case you wrote when you were at the Oregon Supreme Court in State v. Porter, 1991, that was the point of the Oregon legislature writing the traffic violation statutes to limit detention for the ostensible purpose of the detention. But what happened here was something quite different. Upon getting the license, Officer Silva did not go directly to his car and perform a check. Instead, he turned and spoke to the backup officer who by then had arrived. He returned to Mr. Tindall, and he said, Can I search you for drugs and guns? He didn't say there was any reason to be concerned about his own safety, and Mr. Tindall said, No. And Officer Silva then said, Are you sure I can't search you for drugs and guns? And Mr. Tindall said, Yes, I'm sure. And then what happened is the backup officer arrives, comes up to speak to Mr. Tindall. Officer Silva has not at that point suspected driving under the influence. The backup police officer, Durbin, he comes up to Mr. Tindall and says, Will you submit to field sobriety tests? Mr. Tindall says, No. So by then, this detention, ostensibly for only a traffic violation of driving while suspended, has gone far beyond its permissible scope. If it only happens that late, it still is being broadened beyond the constitutional bounds that they're permitted to take it. Judge Rawlinson, I believe it was your dissent in Gallegos versus the City of Los Angeles, where the issue on such detention cases is not only was there reasonable suspicion of the criminal activity in the first instance, but once the officers have that reasonable suspicion, if that's what they have, then what do they do? Because if that is only a pretextual stop, we know they're permitted to do that under Wren, we know they can do that. But if they still have to go directly to dispelling or confirming the things that made them have the suspicion in the first place, and in this instance, that's even more true because the State of Oregon has such clear legislation about making sure that traffic detentions are limited in scope to the purpose that they were subject to. Counsel, are you saying that in our analysis under the Fourth Amendment, we are constrained by the Oregon court's... Statutory interpretation. Right. From esteemed authority. Well, there is, clearly the Oregon courts don't bind this court in its interpretation of the Fourth Amendment, but the breadth of a detention for a violation of State law is something that is determined by State law. Right. Well, I don't know. What's your answer then to my question? I think the answer is yes. The way I understand it is if there's a violation of a State statute in terms of how a detained person is dealt with, does that necessarily translate into a Fourth Amendment violation if it would otherwise be a Fourth Amendment violation? The answer is yes. If there's no other basis for the detention, there's no other basis for the State detention than the investigation of something that's defined under State law, then yes. That's a different issue. What case authority are you relying upon to support that argument that the breadth of the investigation for Fourth Amendment purposes is constrained by the breadth of the State law? I don't have one specifically on point, but I can direct you to United States v. Shepard, this Court's decision talking about how it was Montana law governing the arrest of someone for a Montana probation violation that controlled the Court's inquiry for the warrantless seizure under the Fourth Amendment. Also in United States v. Chavez-Valenzuela, that was a question of whether the detention that's independent of any State law question. Chavez-Valenzuela talks about whether the breadth of the detention has exceeded its permissible scope, talks about tailoring everything that's happening during the detention to the basis for the stop in the first instance. So I think Chavez-Valenzuela and cases like it make the same point, even though it's not saying that this Court isn't in any way bound by State law interpretation of the Fourth Amendment. Thank you, counsel. We appreciate the arguments of both parties. They've been extremely well done and helpful. Actually, that's been true all night. I'm sorry the other lawyers aren't able to hear that. But we appreciate it. The case just argued is submitted and we are adjourned.
judges: Graber, Rawlinson, Moskowitz